Millig-an, J.,
delivered the opinion of the court:-
The claimant seeks by this action to recover the net proceeds of one hundred and fifty-three bales of cotton, twenty-seven large boxes of tobacco, weighing 2,779 pounds, and twenty-nine small boxes, iveighing 580 pounds, which he alleges were captured by the United States military forces, under General N. P. Banks, at or near Opelousas, Louisiana, in the year 1863.
The facts on which the case rests are found to be as follows:
1. The claimant is a subject of the government of France, which, by law, accords to citizens of the United States the right to sue that government substantially as they can sue the United States.
2. He appears never to have violated his neutrality, or in anjr way to have given aid or comfort to the rebellion.
3. The proof, in general terms, shows that he owned large quantities of cotton, which was stored in and around the town of Opelousas, Louisiana. The cotton in Opelousas was removed to the country, on the approach of the United States soldiers, by order of the town authorities, for the safety of the town.
4. The claimant relied on the following certified copy of an original paper found in the War Department to prove the quantity of cotton claimed in this action, viz:
*410 "List of cotton belonging to Joseph Bloch, and tahenfor account of the United States, up to 17th of May, 1863.
* * * * #
"1 certify that one hundred and fifty-three bales cotton 'have been taken from. Mr. Block, by order of Muj m-General B inks.
“T. E. OHICKER1NG, ilColonel, and Military Governor Opelousas.
“L. D. Sargent,
“Lieutenant-Colonel, United States Volunteers, and

"JProvost Marshal of Opelousas, LotiisianaP

This copy is authenticated as follows :
“ It is hereby certified that the accompanying papers are true copies of originals on file in the War Department- pertaining to the case of Joseph Block.
“ JAMES A. HAR.DIE, “Inspector-General.7’
“ Be it known that James A. Hardie is an inspector-general of the Army of the United States, and that his signature, as above, is genuine.
“ Witness my hand and the seal of the War Department this seventh day of February, in the year of our Lord one thousand eight hundred and sixty-eight.
“ E. M. STANTON,'

"Secretary of War.”

The defendants, by their Assistant Attorney-General, objected, on the submission of this case to the court, to the reading of the foregoing papers, as they had previously done in their brief, which had been on file for more than a year before; and the court, as a conclusion of law, sustained the objection and refused to admit it as evidence.
5. Independent of the receipt, which was ruled out by the court, the claimant is shown to have been the lawful owner of one hundred and nineteen bales of cotton, which-were seized by the United States military forces, hauled to Barre’s Landing on the Mississippi River, and then turned over to a United States quartermaster, and by him shipped to New Orleans, and there placed under the control of Colonel S. B. Holabird, chief quartermaster at that place.
6. It further appears that the claimant owned large quanü *411 ties of tobacco, wliicb were also seized by tlie United States soldiers, some of which was issued to the troops, and other portions of it hauled to Barre’s Landing; but no part of it is satisfactorily traced to the hands of the chief quartermaster at New Orleans, or in any way shown to have been sold and the proceeds paid into the Treasury.
7. S. B. Holabird was the chief officer of the Quartermaster Department at New Orleans, and had charge of all captured property arriving there. About the time the claimant’s cotton was shipped to him, he' is shown to have received large quantities of cotton coming from the region of Opelousas, some of which he shipped to New York and Boston, which was sold by the Treasury agents there, and the remainder was sold by him at New Orleans, and the proceeds taken up on his returns and accounted for to the Treasury of the United States.
8. The names of persons from whom property was captured and turned over to Holabird do not appear on his accounts returned to the Department; but it does appear from the Secretary of the Treasury’s report, that Holabird’s sequestration accounts show that he received and sold cotton, sugar, and other, property, in the year 1863, to the amount of $1,102,102.87; and that, from the 15th of May to the 13th of June, 1863, he received about two thousand three hundred and forty-six bales of cotton over the Opelousas Railroad; so that the court find, as a matter of fact, that one hundred and nineteen bales of the claimant’s cotton were sold, and the proceeds either acually or constructively paid into the Treasury of the United States.
9. The court further find that the fair average net value of the claimant’s cotton was $192 per bale.
On the foregoing facts only two questions are presented for decision .- First., the action of the court in excluding the copy of the receipt signed by Colonel Chickering, and offered by the claimant to prove the amount of cotton claimed in this suit; and, second., the right of the claimant to recover the proceeds of one hundred and nineteen bales of cotton, which have not been directly traced into the Treasury.
The first question has never received an authoritative decision of this court, and demands a careful review of the grounds on which it rests. The twenty-fifth rule of practice adopted by *412 this court declares that “records, papers, or documents from an Executive Department, which may be offered in evidence by a claimant, must be those which have been transmitted to the coart under a regular call for the same, or they must be duly certified and authenticated pursuant to the acts of Congress in such cases made and provided.” Under this rule and the acts of Congress on which it is framed,, there is no difficulty in procuring certified copies of records, papers, and documents from the Executive Departments; but, after they have been brought into court and filed by the clerk as required by the rule, there is much more difficulty in ascertaining whether they are properly authenticated, and what weight should be given to them as evidence. To determine these questions the rules of evidence and the acts of Congress in respect to such records and papers must be examined and applied; and, for convenience, we will consider what records, papers, and documents are made evidence under the acts of Congress; and, ¡second, how they should be authenticated.
On principles of the common law, official registers, or books kept by persons in public office, in which they are required, whether by statute or by the nature of their office, to write down particular transactions occurring in the course of their public duties and under their personal observation, as well as all other documents of a public nature, are generally admissible in evidence. The degree of confidence due to such documents arises out of the fact that they have been made by accredited agents appointed for the purpose, and that their subject-matter is of a public character. (1 Greenleaf on Evid., § 483; 1 Stark Evid., 195.)
“ When the books themselves,” containing such public Avritings, says Mr. Greenleaf, vol. i, § 485, “are produced, they are received as evidence without further attestation; but they must be accompanied by proof that they came from the proper repository. When the proof is by a copy, an examined copy, duly made and sworn to by any competent witness, it is always admissible.”
But without tracing the rules of the common law further, it must be observed that the question arising on this record rests on the acts of Congress making copies of records, books, and papers, when duly certified, evidence in the courts of the United States. As early as 17-89 Congress provided that all copies of *413 records and papers in tbe office of tbe Department of State, authenticated tinder tbe seal of said Department, “ shall be evidence equally as tbe original record or paper.” (Act of September 15, 1789, § 5; 1 Stat. L., p. 69.)
In 1792 (1 Stat. L., p. 69) a similar statute was passed in respect to transcripts from tbe books and proceedings in the Treasury Department, and in 1849 (9 Stat. L., p. 347) a like provision was made for tbe office of tbe Solicitor of tbe Treasury.
The third section of this act provides that “ all books, papers, documents, and records in tbe War, Navy, Treasury, and Post-Office Departments, and tbe' Attorney-General’s Office, may be copied and certified under seal in the same manner as those in the State Department may n'ow by law be, and with tbe same force and effect.”
A like provision is made, with tbe same effect, by the Act May 31sf, 1854, (10 Stat. L;, p. 297, § 2,) for copies of books, papers, documents, and records in tbe Department of the Interior.
Under these several statutes, all tbe different Departments, including tbe offices of tbe Solicitor of tbe Treasury and tbe Attorney-General, are authorized to have and to use official seals, and under them, respectively, to authenticate copies of tbe books, papers, and documents in their several Departments. The language employed in all the acts is substantially the same as that used by tbe common-law writers in respect to tbe same subject, and must be understood and interpreted by the same reasons that govern at tbe common law.
Transcripts from the records or books of tbe different Departments, when authenticated by tbe seal of such Department, are evidence both at tbe common law apd by statute; but tbe words “ documents and payers,,” used in tbe several acts of Congress, cannot be held to mean every document or paper on file in the Department, but such only as were made by an officer or agent of tbe Government in tbe course of the discharge of bis official duty. Any other rule of interpretation would defeat the reason on which all public writings are admissible as evidence, i. e., that they have been made by authorized and accredited agents, appointed for tbe purpose, and that the subject-matter of such writings is of a public nature.
Official documents, duly certified, need no further proof; but *414 other documents, so certified, do not, by the mere fact of certi-fication, become so authenticated as to entitle them to be received as evidence if they are objected to ;' but the originals must be produced and proved according- to the course of the common law.
On the second inquiry arising on this branch of the case, which refers to the mode of authenticating copies, we need only say that the acts of Congress under which such authentication is authorized so'specifically point out the manner in which it shall be doné, and the officer by whom, that there is little room for explanation. The law, when copies are made evidence by statute, demands that the mode of authentication prescribed by statute shall be strictly pursued. (Smith v. The United States, 5 Peters, 290-300.)
Applying the rules already laid down .to the case under consideration, it is obvious that a copy of a paper purporting to be signed by Colonel Ohickering, and relied on by the claimant to prove the amount of cotton claimed in this suit, is not admissible without proof of its execution. The original paper, if executed at all, was not such an official paper as it was the duty of Colonel Ohickering to return to the War Department. It belonged properly to the claimant, and was his private paper, and by him placed in the War Department, and a copy thereof produced uuder the certificate and seal of that Department and offered in evidence in his own behalf without proof of its execution.
The certificate and seal of the Department did not prove the due execution of the paper, and the claimant was bound, if he used it at all a,s evidence, to produce the original and prove it according to the course of the common law.
Under the second general proposition, which involves the claimant’s right to recover the proceeds of one hundred and nineteen bales of cotton, which have not been directly traced into the Treasury, we need only say, this is not an open question in this court. In Hudnall's Case, (3 C. Cls. R., p. 291,) which, in all its essential features, so far as this question is concerned, is identical with this case, the court held, in substance, that when a quartermaster had expended money derived from the sale of captured and abandoned property in the military service, and afterward taken the same up on his accounts and settled for it with the Government, that .that was a constructive pay *415 ment of tbe proceeds of sucb sale into the Treasury under the abandoned captured property acts.
The facts of this case do not clearly show whether the proceeds of the claimant’s cotton reached the Treasury in this indirect way, or directly through the sales of the cotton-agents at New York or Boston; but they leave no doubt that the proceeds went- into the Treasuryin the one or the other way, and we have no hestitation in holding the claimant' entitled to recover in this action.
As to the tobacco, it clearly appears that none of it, either actually or constructively, reached the Treasury, and tve therefore refuse to the claimant judgment for it.
On the whole case, we hold the claimant entitled to recover the proceeds of one hundred and nineteen bales of cotton, at $192 per bale, making $22,S48, for which judgment will be entered.