## COHN v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. April 22, 1919.)

No. 169.

1. INDICTMENT AND INFORMATION ⊜139—MOTION TO QUASH—TIME FOR MAKING.

   A motion to quash an indictment on the ground that it does not charge facts sufficient to constitute an offense may be made at any time, even after verdict.

2. RECEIVING STOLEN GOODS ⊜7(2)—SUFFICIENCY OF INDICTMENT—INTENT.

   An indictment under Cr. Code, § 48 (Comp. St. § 10215), for receiving property stolen from the United States, which does not charge that the accused received or retained the property "with intent to convert to his own use or gain," is fatally defective.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. CRIMINAL LAW ⊙⊐400(3), 430—SECONDARY EVIDENCE—COPIES OF "OFFICIAL DOCUMENTS."

Documents used as evidence in a naval court-martial, and required by statute to be transmitted to the Navy Department and there kept on .file for two years, are "official documents" while so kept, and under Comp. St. § 1494, authenticated copies of such documents are admissible in evidence equally with the originals, and unauthenticated copies are inadmissible as secondary evidence.

In Error to the District Court of the United States for the Eastern District of New York.

Criminal prosecution by the United States against Samuel A. Cohn. Judgment of conviction, and defendant brings error. Reversed.

Robert H. Elder, of New York City (Charles E. Russell, of Brooklyn, N. Y., and H. Goldstein, of New York City, of counsel), for plaintiff in error.

James D. Bell, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith, Sp. Asst. U. S. Atty., of New York City, of counsel).

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The defendant below has been tried and convicted under an indictment the substance of which is stated in the margin.[1]

The court refused to set aside the verdict and sentenced the defendant to imprisonment in the federal prison at Atlanta for a year and three months.

The evidence discloses that the father of the defendant, at the time of the commission of the offense charged, conducted a tailoring shop in Brooklyn, and that the defendant was in charge of it for the father.

It appears that the custom among tailors was, when cloth of the type in question came into their possession to be made up into uniforms, before cutting into it, to send same to spongers to be sponged. In the process of sponging, if the spongers found any defect or flaw in the cloth, they indicated it by drawing a small white piece of cloth through the selvage of the material opposite the place where the defect existed and notified the manufacturer of the cloth of the defect, giving to the manufacturer, at the same time, the name of the supposed purchaser thereof from the manufacturer. Certain cloth, but whether it was part of that which was the subject of controversy on this trial or not was not developed, was sent from the shop of the accused's father

[1] The indictment charges that the defendant "did unlawfully receive certain property and valuable things, to wit, about 180 yards of cloth intended to be used in the making of United States Navy uniforms, of the goods and property of the United States, which said 180 yards of cloth had theretofore been embezzled, stolen, and purloined by another to the grand jurors unknown, and who cannot theretofore be more definitely stated herein, he, the said Samuel A. Cohn, then and there knowing at the time he so received the said 180 yards of said cloth that the same had been so embezzled, stolen, and purloined, against the peace and dignity of the United States of America, and contrary to the form of the statute of the said United States in such case made and provided."

⊙⊐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to the spongers to be sponged. They found some defects in the cloth and notified the manufacturer and reported the name of Herman Cohn as that of the original purchaser of the cloth. The manufacturers replied that they had sold no such cloth to Cohn. They had sold cloth to the Navy Department and they took the matter up with the department. This led to investigation, and the laying of charges to the effect that one A. W. Meade, who was Chief Yeoman on the United States Steamship Arkansas, had stolen various quantities of navy blue cloth from the department and caused same to be delivered at the shop of Herman Cohn, and which defendant was accused of having bought. Officers made a visit to the tailoring shop and there some cloth, which was put in evidence, was found. Conversations were had with the defendant, some letters were taken out of the business files, and later were used as evidence. The result of the investigation which ensued was the indictment and conviction of the defendant.

The first question to be considered by this court is as to the sufficiency of the indictment. The indictment is based on section 48 of the Criminal Code, which may be found in the margin.[2]

The objection alleged against the indictment is that it does not charge in the words of the Criminal Code that the defendant received the property "with intent to convert to his own use or gain." This objection was not raised until after the jury was impaneled and sworn. It appears that after the jury was sworn counsel for defense moved that the United States Attorney be required to declare of record under what section of the Criminal Code the indictment was found and upon which he purposed to prosecute the defendant. The reply was:

"There are two sections, 35 and 48, and we have proceeded and will now proceed under 48."

Thereupon the defendant's counsel moved to quash the indictment on the ground that it did not state facts sufficient to constitute a cause of action under section 48 of the federal Penal Code. The court took the objection under consideration and announced on the next morning that he had examined the authorities with some care and denied the motion. An exception was duly taken and the matter has been assigned as error.

[1] A motion to quash ordinarily must be made before arraignment or plea; but, if an indictment does not charge facts sufficient to constitute a crime, the objection may be raised even on a motion in arrest of judgment, the defect not being cured by verdict. The defect alleged in this case is one of substance. The suggestion that the omis-

[2] "Sec. 48. *Receiving, etc., Stolen Public Property.*—Whoever shall receive, conceal, or aid in concealing, or shall have or retain in his possession with intent to convert to his own use or gain, any money, property, record, voucher, or valuable thing whatever, of the moneys, goods, chattels, records, or property of the United States, which has theretofore been embezzled, stolen, or purloined, by any other person, knowing the same to have been so embezzled, stolen, or purloined, shall be fined not more than five thousand dollars, or imprisoned not more than five years, or both; and such person may be tried either before or after the conviction of the principal offender." Act March 3, 1875, c. 144, § 2, 18 Stat. 479; Act March 4, 1909, c. 321, § 48, 35 Stat. 1098 (Comp. St. § 10215).

sion relates to a matter of form and so came too late is clearly untenable.

[2] The trial judge apparently thought that, because there was no comma in the statute between the phrase "in his possession" and the phrase "with intent to convert," the intent clause was intended to modify the verbs "have" and "retain" only. That construction of the statute does not conform to the construction which appears to have been placed upon it by the Supreme Court in Kirby v. United States, 174 U. S. 47, 53, 19 Sup. Ct. 574, 43 L. Ed. 890. In that case it was held incumbent upon the government to prove beyond a reasonable doubt: (1) That the property was in fact stolen from the United States; (2) that the defendant received or retained in his possession with intent to convert to his own use or gain; (3) that he received or retained it with knowledge that it had been stolen from the United States. And Mr. Justice Harlan, who wrote the opinion of the court, said that—

"The act of Congress upon which the present indictment rests makes the receiving of stolen property of the United States with the intent by the receiver to convert it to his own use or gain, he knowing it to have been stolen, a distinct, substantive felony."

The indictment now under consideration charges: (1) That the property was stolen; (2) and that it was the property of the United States; (3) that the defendant unlawfully received it; (4) that defendant knew at the time he received it that it had been stolen. But the allegation that defendant received or retained the property with the intent to convert to his own use or gain is not to be found. And we are obliged to hold upon the authority of Kirby v. United States, supra, that the failure to allege that defendant received it "with intent to convert to his own use" is a fatal defect.

[3] While there must be a reversal on the ground mentioned and we might conclude our decision at this point, we deem it important to state our opinion as to the inadmissibility of certain evidence admitted over objection and exception in order that a repetition of the error may be avoided on the second trial if one takes place. It appears that one of the pay inspectors of the United States Navy visited the shop prior to defendant's arrest and asked to see his correspondence. This the defendant consented to, and the correspondence was produced. Carbon copies of letters addressed to Meade, the Chief Yeoman of the Arkansas, were found which the defendant stated he had written. The inspector had defendant write on these carbon copies that they were true copies of the originals. There were also found original letters written by Meade. These with carbon copies of the replies the inspector took away with him. He had two typewritten copies made of them, and of some of them photographic copies were made. The originals were not produced at the trial, neither were the original carbon copies. The inspector was asked what became of the file of correspondence which he had taken from the shop, and he replied that the last time he saw them they were in evidence in the court-martial case (of Meade) in the Brooklyn Navy Yard. He was asked what the naval routine would be with respect to documents used in a court-

martial, and he replied that they would be filed with the record of the court-martial in the office of the Judge Advocate General of the Navy in Washington, as a part of the records of the United States government. The inspector having identified the carbon copies, the typewritten copies and the photographic copies which he had made, the government offered them in evidence. The defense objected on the ground that they were not originals, were incompetent, and not the best evidence. Counsel for the government in reply offered to take the stand and testify that the papers came from the Judge Advocate in Washington, but counsel for the defense said he would not put him to that trouble and that the quality of the evidence would not be altered by their coming from the Judge Advocate's office. The admission that the originals were in that office showed, he said, that—

"They are not lost, strayed, or stolen, and it must be either one to make this secondary evidence in the case."

No evidence had been introduced to show that the files had been withdrawn from the Judge Advocate's office, or that it was impossible or even difficult to produce the originals, or that a request had been made upon any one to produce them. And there was no evidence that the typewritten and photographic copies were accurate reproductions of the originals. That photographic copies may be received in evidence under some circumstances is no doubt the law.

In Wigmore on Evidence, vol. 1, § 797, that writer considers the question whether photographic copies may be used at all for the purpose of identifying handwriting, and states that a photograph of a writing may be made to falsify like other photographs and like other kinds of testimony, so that especial care should be taken to secure positive testimony as to the accuracy of reproduction, and he also states that it is generally conceded that a photographic copy of handwriting may be used instead of the original; that if the original is obtainable a photograph is inadmissible; and if the original is not obtainable a copy may be used. In the present case, the photographic copies were admissible in evidence only after it had been shown that they were accurate reproductions of the originals, and the absence of the originals had been satisfactorily accounted for.

The best evidence rule, of course, does not mean that secondary evidence cannot be received if the original is in existence. The rule simply requires that the best evidence that the nature of the case is susceptible of must be produced. The rule has its origin in a suspicion of fraud. If there is better evidence of the fact which is withheld, the presumption is that the party has some sinister motive for not producing it. But as the Supreme Court declared in United States v. Reyburn, 6 Pet. 352, 366 (8 L. Ed. 424):

"Rules of evidence are adopted for practical purposes in the administration of justice, and must be so applied as to promote the ends for which they are designed."

In that case it was charged in the indictment that the defendant had "issued" a commission for a certain vessel that it might commit hostilities against Brazil with which country the United States was at

peace. A witness was asked whether he had seen the commission. It was objected that no evidence as to the character or contents of the commission could be received because the United States had not produced the commission and had not obtained a copy of it from the archives at Buenos Ayres, nor shown that the government had made any effort to obtain a copy. The court held that, when the nonproduction of the written instrument is satisfactorily accounted for, secondary evidence of its existence and contents may be shown; the rule being applicable to criminal as well as civil suits. And the court went on to say that—

"If it should be admitted that a record is there [at Buenos Ayres] to be found of this instrument, and that on application a copy of it might have been procured, it would be carrying the rule to pretty extravagant lengths to require the application to be made."

In the pending case this court takes judicial notice of the acts of Congress and of the fact that articles for the government of the Navy require the proceedings of summary courts-martial to be transmitted to the Navy Department "where they shall be kept on file for a period of two years from date of trial, after which time they may be destroyed in the discretion of the Secretary of the Navy." U. S. Comp. St. 1916, Ann. vol. 4, § 3002. The provision requiring the record to be kept on file for a period of two years, etc., was added to the law by an amendment by Act February 16, 1909, c. 131, § 14, 35 Stat. 622. In the view we take of this case, we do not find it necessary to decide whether a trial court has the right to compel by a subpoena duces tecum the production in any part of the United States of any document or paper which an act of Congress says shall be kept on file in one of the departments at Washington. If the department is compelled to produce it in court in New York or San Francisco, it certainly is not kept on the files of the department during the time required for its production and return. But however that may be, there can be no doubt that if the departments at Washington can be compelled to produce in any part of the country the originals of any documents or papers they may have on file, the greatest embarrassment and confusion to the department would be the consequence of such a decision. And at the same time a great and unnecessary financial burden might be imposed upon the litigants. We may say in this case, as was said in the Reyburn Case, súpra, that to say that the court, even if it possessed the power to compel the production of the originals, should be required to exercise it under the best evidence rule, would be to carry the rule to pretty extravagant lengths.

In Leathers v. Salvor Wrecking Co., 15 Fed. Cas. 116, No. 8,164 (1875), Mr. Justice Bradley, of the Supreme Court, sitting in the Circuit Court for the Second District of Mississippi held that photographic copies of public documents on file in the War Department at Washington were properly received in evidence; their genuineness having been authenticated in the usual way. The case was in admiralty, a libel having been filed to recover damages for wrecking a steamboat which the defense claimed had been sunk while in the service of the Confederate States and which on the surrender of the Confederate forces was said

to have become the property of the United States. Mr. Justice Bradley, citing no cases, said:

"It is objected by the counsel for the libelant that the documentary evidence in question is not properly authenticated. We think it is sufficiently authenticated to make it competent. The original papers are on file in the War Department, and cannot, without public detriment and inconvenience, be removed. Photographic copies are the best evidence that the case admits of. The wonderful art by which they are reproduced gives us, as we may say, duplicate originals; and in the case of public records or documents properly deposited in the public archives of the country, and which the public interest requires should be there kept and preserved, no better evidence of their character and authenticity can be had than such a reproduction of them by the operation of natural agencies, and an authentication of their genuineness in the usual way, by proof of handwriting. We think the evidence entirely competent and entirely conclusive."

Congress has provided that—

"Copies of any books, records, papers, or documents in any of the Executive Departments, authenticated under the seals of such departments, respectively, shall be admitted in evidence equally with the originals thereof." U. S. Compiled Statutes 1916, Ann., vol. 3, § 1494.

Congress began to legislate on this subject at the very beginning of the government, the first act being passed in 1789, when it was provided that all copies of records and papers in the office of the Department of State should be evidence equally as the original record or paper. Act Sept. 15, 1789, c. 14, § 5, 1 Stat. 69 (Comp. St. § 1494). In 1797 a similar statute was passed in respect to records and papers in the Treasury Department. Act March 3, 1797, c. 20, 1 Stat. 512. And from time to time similar statutes were passed respecting records and papers in all the different departments. In Block v. United States, 7 Ct. Cl. 406, 413, the statutory provision above referred to was considered, and the court declared that—

"The words 'documents and papers,' used in the several acts of Congress, cannot be held to mean every document or paper on file in the Department, but such only as were made by an officer or agent of the government in the course of the discharge of his official duty. Any other rule of interpretation would defeat the reason on which all public writings are admissible as evidence, i. e., that they have been made by authorized and accredited agents, appointed for the purpose, and that the subject-matter of such writings is of a public nature.

"Official documents, duly certified, need no further proof; but other documents, so certified, do not, by the mere fact of certification, become so authenticated as to entitle them to be received as evidence if they are objected to; but the originals must be produced and proved according to the course of the common law."

But if the "originals" above referred to happen themselves to be on file in one of the departments, there must be power in the courts to compel their production when needed in a judicial proceeding, or else transcripts or copies of them certified under the seal of the department must be admissible in evidence. And if the statute applies only to such writings as "were made by an officer or agent of the government in the course of the discharge of his official duty," then, of course, it has no application to letters by this defendant to the Chief Yeoman of the battleship Arkansas, although it would extend to any letters

written by the latter to the defendant or to the defendant's father. We are not inclined to put so narrow a construction upon the stat-ute, and we can see no substantial reason for thinking that copies of such letters as are on file in the record of the proceedings of the court-martial, and which are authenticated by the Department of the Navy as provided in the act, may not be introduced in evidence at the trial of the defendant. The statute authorizes the introduction in evidence of copies of any documents or papers which are required by law to be kept on file in the departments, provided such copies are authenticated under the seal of the department in which the document is kept. It is the opinion of the majority of this court that the statute was intended to apply at least to any document or paper which is by law required to be filed and kept on file in any of the Executive Departments of the government. A document or paper which is re-quired to be so filed and kept on file is in the opinion of the majority of the court an official document as much so as one which is written or published by an officer in his official character or in the performance of an official duty. The word "official" is defined in the New Standard Dictionary as follows:

"1. Of or pertaining to an office or public trust; as official duties.
"2. Derived from the proper office or officer, or from the proper authority; authoritative; as, an official report."

A paper which must be kept on file in a designated office and which cannot be removed therefrom, pertains to that office, and so becomes official. And we are unable to see why the statute is not as applicable to that class of official papers as well as to the other class. The one class is as much within the letter of the statute as is the other, and it is also as much within the reason and the spirit of the statute.

The introduction in evidence of copies of letters on file in the Department of the Navy at Washington, and which are required by law to be kept there, and which were not authenticated under the seal of the department, was error. Copies so authenticated would have been as admissible as the originals; copies not so authenticated were not as admissible as the originals.

In what has been said we are not to be understood as intending to lay down the proposition that copies of official papers on file in an Executive Department can be received in evidence only when they are authenticated under the seal of the department. It is not our understand-ing that the provision of the statute under consideration was intended to be exclusive. But if copies not authenticated as provided in the statute are to be introduced in evidence, it is certainly necessary that a proper foundation for their admission should be laid, having in mind the general rule that no evidence shall be received which presupposes that the party who offers it can obtain better evidence.

Judgment reversed.