## UNION INDEMNITY CO. v. LEIDESDORF.

### In re UNIVERSAL PILE FABRIC COAT HOUSE, Inc.

Circuit Court of Appeals, Second Circuit. January 6, 1930.

No. 110.

Bernard J. Vincent, of New York City (Robert H. Elder, of New York City, of counsel), for appellant.

Bernard Hershkopf and I. Gainsburg, both of New York City, for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. The Universal Pile Fabric Coat House, Inc., sued on a policy of insurance issued against burglary. A receiver in bankruptcy was later appointed and substituted as plaintiff. A recovery was had below. The insurance was effective November 6, 1924, and the burglary is alleged to have been committed on December 5, 1924, at the insured's place of business in New York City. It claimed the theft of $29,688.19 worth of beaver sets—fur collars and cuffs cut in shape to be sewed on ladies' coats—and some crepe de chine silk. This merchandise is said to have been delivered November 29, 1924, December 2, 1924, and December 5, 1924, by Brody & Funt, Inc., whose shareholders organized the bankrupt. The policy of insurance was for $30,000. It contained the following clause:

"A. For all loss by burglary of merchandise, usual to the Assured's business as described in the schedule hereof, and furniture, fixtures and equipment, from within the Assured's premises as hereinafter defined, occasioned by any person or persons who shall have made felonious entry into the premises by actual force and violence, when the premises are not open for business, of which force and violence there shall be visible marks made upon the premises at the time of such entry by tools, explosives, electricity or chemicals."

The insured was wired by a protective company's burglary alarm system. At 6:29 p. m. on December 5, 1924, the burglar alarm signal was closed for the night. At 6:43 the electric signal, showing the door of the premises had been opened, appeared. At 6:52 the protective company's representatives arrived at the premises and signaled back their presence there. They had been there four minutes. Thus this record disclosed that the door was locked at 6:29 p. m., the signal apparatus was in place, and the night signal sent to the home office of the protective company at 6:43, a lapse of 14 minutes; the trouble signal appeared, and within five minutes the protective company's men were on the premises. This record of time and the occurrences are not in dispute. The breaking and entry must therefore have occurred within fourteen minutes, between 6:29 and 6:43; about five minutes, 6:43 to 6:48, was the time when it was possible for the burglars to have carried away eight bags of fur and three bundles of silk. An officer of the bankrupt testified that this merchandise was ten feet away from the door which was broken open. One of the officers of the insured left the premises between 6:20 and 6:30. The damage to the door by the breaking and entry must have occurred between 6:29 p. m. and 6:43 p. m.

The door which was broken open was in the rear on the sixth floor of the building opening to a stairway having a small platform and turn at each floor, but extending from the roof to the sidewalk. The de-

fense interposed denied the burglary; at least that there was no "force and violence," and no "visible marks" upon the premises, at the time of entry, by tools, were shown to have been made as a result of the burglary. In short, the appellant claims that the burglary was a sham; that it was physically and mechanically impossible to have entered from the outside and damaged the lock and door as their physical appearance exhibited injury. On the other hand, the theory of the appellee is that the burglars ascended the rear stairway from the street to the rear door on the sixth floor and broke it open quickly and carried out the merchandise and disappeared during this short interval of time.

From the photographs in evidence, an examination of the physical exhibits, door and door frame, lock and its parts, and the demonstrations made at the oral argument, we are convinced the evidence did not warrant the trial judge sending as a question of fact to the jury whether or not a burglary was committed. It was established that it was physically impossible for burglars working from the outside to have inflicted the wounds that the lock, the door, and the adjacent parts showed. The injury to the lock and door conclusively shows that some of them were inflicted from the inside. Two burglar jimmies were found on the premises, and it is claimed that these were used in the burglary. The use of these, with the marks shown, makes it impossible of belief that the entry was made from the outside. It was mechanically impossible to have used them on the outside and made entry, doing the injury to the lock, and still find it hanging as it was. Appellant's Exhibit A and Appellee's Exhibit 5 show the damage to the outside of the door. The metal covering was around the nose of the batten of the door and was forced back over itself. White scratches appeared which were made on the vertical angle iron constituting the stop. One picture (page 6) shows this stop and the scratches in gray lines. The heads of the machine screws which held the strike and slim in place are shown in the picture. The stop was undamaged except for these scratches. The stop was a strong vertical solid piece of steel which could not have been pushed by the jimmies. In one of the pictures (page 7), the slim and projecting screws are plainly seen, and show no damage to the stop. On the inside of the batten was the case of the lock in close proximity with the edge thereof and with the edge of the stop. No new opening was made by the use of tools from the outside which admitted passage of the tip or end of any tool from the outside to contact with the lock case or its housings or the strike of the slim. Therefore, the only use that could be made of the jimmy was from the outside around the nose of the batten through to the inside and in contact with the housings of the lock so as to cause the breaks shown in the pictures. But it is evident that no such point of entrance was made. The gray lines at the end of the housing show that the metal which covered the batten was forced back in a little roll which prevented an instrument from reaching the housings and thus twisting them into the form they appeared. The metal rolled back and lifted up (page 10) would have blocked the jimmy directed toward the housings, and the scars on the nose of the wing corroborates this conclusion. The deep scars (page 8) on the outside edge of the batten could not have helped a jimmy to get in; the effects produced on the inside edge were a lifting and pushing back of the metal cover so as to prevent touching the housings. And, since no hole was bored or cut to admit the point of the jimmy to the lock, the door would have had to be opened so as to break the lock and give the trouble signal to make an entrance large enough to admit the point of a jimmy.

It is mechanically clear that the lock could only have been broken, as it appeared, from the inside. The injuries to the lock confirm this. The bottom housing was forced downward, and so far that it was broken almost off the case (pages 9, 10). The top housing was forced upward. The two moved in different directions, one vertically upward and one vertically downward when bent or broken, and necessarily required separate applications of the instruments used, one prying upward and the other prying downward. This could not have been done from the outside. In order to introduce a jimmy from the outside far enough to come in contact with either of these housings, the door would have had to be so far open that the lock would have been broken and entrance effected. The conclusion is irresistible that the lower housing was broken by a sharp blow downward by something from the inside, for a scar is left from that blow. The top housing was forced upward by thrusting an instrument between the middle and the top housing, using the middle one as a fulcrum on which to rest the instrument with which a sharp jog upward broke the top housing. These scars on the lock are well marked and indicate how the job was performed.

28

There are convincing improbabilities in the theories of the appellee. The theory that a strong force directed from the outside against the nose of the door did this damage by some movement of pressing and twisting with one of the jimmies is disputed by the fact that the bottom housing was forced away down from its place; the bottom bolt when locked engaged with the lower housing $\frac{3}{32}''$; the top bolt when locked engaged with the middle housing $\frac{3}{32}''$. If the force, assumed by the appellee, had been used just as soon as the lower housing was displaced $\frac{3}{32}''$, it would have become free of pressure and no such large displacement as is shown could have resulted. The same is true of the displacement of the top housing. Therefore it is irresistible that the housings must have been displaced by some instrument in direct contact with them, and that instrument could not have been used from the outside. The bolts were found in an unlocked position, which indicates that they were in that position at the time the injuries were inflicted. If the bolts had been in a locked position when the lock was attacked, either from within or without, these bolts would have been jammed in the housings and left there immovable. It was mechanically impossible for them to have been forced into an unlocked position by the power applied from without by jimmies or like instruments.

The strike was forced off the slim and pulled over the tops of the screws; the machine screws held fast. The force applied did not pull them out; at the same time the screws in the lock case held. The strike was pulled off over the tops of the screws and the screws that held the case to the door were ordinary screws embedded in wood. By every rule of force, they should have given way before the machine screws embedded in the steel or before the strike could have been drawn off over the top of the screws. The explanation of this is found in the fact that the strike was twisted and scarred. Its bend suggests that some instrument was thrust under it and pried up. The scars on the strike show the marks of the tool that was thrust under and lifted against its under side; that is, the strike was not pulled off as by a forcing open of the door and as by forcibly prying apart the lock bolts from the strike, but were pried off by a tool inserted under it. The strike fitted on one way only, with the curved sides of the loop away from the housings. The scars on the under side of the strike established that it was not pulled off by the force of the door opening, and the lock case and its screws pulling against

it, but necessarily by an instrument thrust under it and prying it off over the screws. Moreover, the interior parts of the lock were not disturbed by the breaking. It is very unlikely that, if the strike had been pulled off over the tops of the screws by force from the lock case, bolts, and lock screws, the strike would have been twisted as it appeared. If the strike, when engaged by the lock bolts, had been forced off its seat on the slim by pulling from the case and bolts, it would have hung to the bolts and not fallen to the floor as it was found. The fact that the bolts were in an unlocked position, free from the strike, shows it could not have been torn off by pulling from the bolts. If the strike had been torn off while it was locked in by the bolts, receiving the twists it now possesses, it would now be possible to adjust it between the housings under the bolt holes (in the housings), so that now the bolts could be put down through these holes, but that is an impossibility and establishes that the contortions imparted to the two pieces were so done when they were separated and not when they were in conjunction. Moreover, the injury on the top of the housing was by an upward thrust of an instrument balanced on the middle housing where apparently the jimmy rested during the movement (page 8). This caused a corresponding scar on the end of the bolt in the top housing. The machine screws which were placed through the strike and the slim in the steel frame did not give way to the pressure applied. They remained sticking out after the breaking (pages 9, 13). The screws which held the case on the door were ordinary screws embedded in wood. The latter should have given way before those embedded in steel. Neither set gave way, and the strike had been pulled off over the tops of the machine screws and dropped to the floor. A great force must have been applied which caused this damage to the strike, twisting it badly and ripping the edges of the holes in which the machine screws had rested. The amount of distortion of the strike indicates how great was the force applied. If injuries had been inflicted from operations from the outside when the door opened, the bolts in the locked position would not have been separated from the strike; either the strike would have hung in the case, or the case, coming loose, would have hung in the strike.

The opinions of the appellee's experts, expressing the view of how the locks might be picked from the inside or how the damage could have been made from the outside, clash with these physical and mechanical impos-

sibilities of performance. They fail to raise an issue of fact. It was demonstrated beyond a reasonable doubt by the appellant that this lock was broken from the inside.

There was therefore no felonious entry into the premises by actual force or violence "when the premises were not open for the bankrupt's business, and there was no visible mark of force and violence resulting from the burglar's entry by tools, explosives, electricity or chemicals," as required to render appellant liable under the terms of the policy. In the view we take of this evidence, we do not pass upon the credibility of the witnesses or the weight of evidence, but we hold that there was no credible evidence to submit to the jury on the claim of a felonious entry and burglary. Small Co. v. Lamborn & Co., 267 U. S. 248, 45 S. Ct. 300, 69 L. Ed. 597; Union Pacific Ry. Co. v. McDonald, 152 U. S. 262, 14 S. Ct. 619, 38 L. Ed. 434; N. Y. Tel. Co. v. Beckers (C. C. A.) 30 F.(2d) 578; Napier v. Greenzweig (C. C. A.) 256 F. 196.

■ It is argued that there is no certificate by the trial judge or the clerk that the record contains all the evidence adduced before the court and jury upon the trial, and therefore the assignment of error that the court below erred in denying the appellant's motion to direct a verdict at the end of the appellant's case is not reviewable. Krauss Bros. Co. v. Mellon, 276 U. S. 386, 48 S. Ct. 358, 72 L. Ed. 620; Reilly v. Beekman (C. C. A.) 24 F.(2d) 791; McHale v. Hull (C. C. A.) 16 F.(2d) 781. No valid claim is advanced that there is any testimony or exhibits, other than the physical exhibits, omitted from the bill of exceptions. The physical exhibits were produced at the oral argument by consent. All the exhibits which were not and could not be part of the bill of exceptions were stipulated to by identifying marks, in the order settling the bill of exceptions, and it was agreed that the originals of such exhibits might be presented to this court at the oral argument. In the cases cited and relied upon, it was shown that there were important omissions or the bills of exceptions were imperfectly prepared, but here it is clear, from an examination of the bill of exceptions prepared, that all the proceedings had are recorded, including the opening of counsel, the examination and cross-examination of the witnesses, the motions for judgment, the charge of the court, and the verdict of the jury. On the face of the record, it appears there are no omissions. The trial judge, in certifying the record, referred to the "foregoing bill of exceptions," and it is allowed as such. Rule 26 of this court permits the parties to stipulate between themselves what shall be printed as the record on appeal. The parties have stipulated in this record that "the foregoing is a true copy of the transcript of the record of the District Court in this action as agreed upon by the parties." The order settling the bill of exceptions is sufficient. See order of settlement in Cohn v. United States (C. C. A.) 258 F. 355, and Romano v. United States (C. C. A.) 9 F.(2d) 522.

Judgment reversed.