## UNITED STATES v. BROOKMAN.

(District Court, D. Minnesota, Fourth Division. February 26, 1924.)

1. **Jury ☞59(1)—Legality of appointment of jury commissioner.**

The provision of Judicial Code, § 276, as amended by Act Feb. 3, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 1253), that the jury commissioner appointed by the judge of the District Court shall be "a well-known member of the principal political party in the district * * * opposing that to which the clerk may belong," is advisory, and not mandatory, and the appointment of a commissioner is not invalidated because there may be a technical question as to whether the political party to which he belongs is the principal one in opposition to that of the clerk.

2. **Criminal law ☞1141(2), 1166½(5)—Irregularity in drawing of jurors, to avail defendant, must have been prejudicial.**

Any irregularity in drawing jurors, grand or petit, cannot avail a defendant whose rights

have not been prejudiced thereby, and the burden is on him to show, by averment of specific facts, that he has been prejudiced and how.

3. **Jury ☞117—Challenge to panel when cause was called for trial held too late.**

A challenge to the panel of jurors drawn for the term in September, filed by a defendant when his case was called for trial November 1, 37 days after his arrest, 16 days after he was held to the grand jury, 12 days after his indictment, and 10 days after arraignment, held too late.

4. **Criminal law ☞787(1)—Instruction that the jury shall draw no inference against a defendant from his failure to testify held not erroneous.**

Under Act March 16, 1878 (Comp. St. § 1465), providing that a defendant shall be a competent witness at his own request, but not otherwise, and that his failure to make such request shall not create any presumptions against him, it is not error to instruct the jury that they shall not draw any inference unfavorable to a defendant because he did not take the stand.

5. **Indictment and information ☞91(2)—Failure to charge that act was "feloniously" committed held not to invalidate indictment.**

Where a crime is made a felony by statute, it is not necessary to charge that it was feloniously committed, unless the statute itself makes a felonious intent an element of the offense.

6. **Indictment and information ☞202(1)—Defects cured by verdict.**

Defect in an indictment by omission of a material allegation, which would have been fatal on demurrer or a motion to quash, is cured by the verdict, where no objection was raised before or during the trial.

7. **Criminal law ☞911, 1156(1)—Order overruling motion for new trial not reviewable.**

An order overruling a motion for new trial is discretionary, and not reviewable in the federal courts on writ of error.

8. **Criminal law ☞1129(3)—Assignment of error not complying with rules presents no question for review.**

An assignment of error in denying defendant's motion in arrest of judgment, which does not comply with rule 11 of the Circuit Court of Appeals, by stating the grounds of the motion or the grounds of error, does not raise any question for review.

9. **Criminal law ☞972—Motion in arrest reaches only errors on the face of the record.**

A motion in arrest of judgment reaches only matters apparent on the face of the record, and for that purpose a bill of exceptions is not a part of the record.

10. **Criminal law ☞1026—Grounds for denial of writ of error.**

If all the questions sought to be raised on a writ of error have been decided adversely to the contention of the defendant by the appellate court to which the case would go if the writ were allowed, or by the Supreme Court, the writ of error should be disallowed, where there is no doubt under the evidence of defendant's guilt.

Criminal prosecution by the United States against Le Roy Brookman. On application by defendant for allowance of writ of error and supersedeas. Denied.

Lafayette French, Jr., U. S. Atty., of St. Paul, Minn.

Donald G. Hughes and Neil Hughes, both of Minneapolis, Minn., for defendant.

McGEE, District Judge. The indictment in the instant case was presented against the defendant on the 19th day of October, 1923. It contains two counts, charging the defendant with violations of the Act of December 17, 1914, as amended, otherwise known as the "Harrison Anti-Narcotic Act." Comp. St. 1918, Comp. St. Ann. Supp. 1919, Comp. St. Ann. Supp. 1923, § 6287g et seq.

On the 22d day of October, 1923, the defendant was arraigned, entered pleas of not guilty, and was tried on November 1 and 2, 1923. When the case was called for trial, the defendant interposed a written "challenge to the entire panel of petit jurors of said term," which challenge was overruled. The jury returned a verdict of guilty on both counts. The defendant was sentenced to imprisonment in the United States penitentiary at Leavenworth, Kan., for the term of five years on each count, the terms of imprisonment to be served consecutively.

On December 29, 1923, what is designated in the moving papers of the defendant as a "motion for a new trial and motion to quash the indictment" was heard and denied, and on the 12th of January, 1924, a motion in arrest of judgment was also heard and denied. The matter is now presented on an application for the allowance of a writ of error and supersedeas.

The assignments of error practically present for consideration three questions: First, whether the petit jury for the October, 1923, term of court was properly drawn, a question, it will be noted, that has no reference whatever to the guilt or innocence of the defendant; second, whether the indictment is fatally defective, when assailed after verdict, because of the omission therefrom of the word "feloniously"; third, whether it was error for the court in its charge to have cautioned the jury against drawing any inference unfavorable to the defendant from the fact that he did not take the stand as a witness in his own behalf. These assignments of error will be taken up and considered in their order.

It may conduce to a clear understanding of the legal questions presented to briefly consider the case submitted to the jury. The first count of the indictment, in the usual form, charges that the defendant on the 14th of September, 1923, in the city of Minneap-

olis, in the state and district of Minnesota, unlawfully and knowingly, sold morphine and cocaine to one Vera Davey. The second count, in like manner, charges that the defendant, at the same place, on the 24th of September, 1923, unlawfully and knowingly sold cocaine to one Ted Baggott.

In support of the first count of the indictment it appeared by the testimony of Narcotic Officers John P. Wall, Owen J. Stearns, and Willis I. Heiberg that Vera Davey was known to them for about one year prior to September 14, 1923; that she was a drug addict; that about noon on the 14th day of September, 1923, she was brought to the office of the Narcotic Division in the Federal Building in Minneapolis, Minn., by a Minneapolis city detective named Walter Palmersten; that a conversation ensued between Wall and Mrs. Davey, in the presence of the other narcotic officers and the police officer, the result of which was that Mrs. Davey agreed to aid and assist the government officers in the matter of apprehending venders and peddlers of narcotic drugs.

When that arrangement was reached, Mrs. Davey, using the phone in the narcotic office, in the presence and hearing of the officers mentioned, called Kenwood 4310, and had a conversation with a person whom her testimony on the trial disclosed was the defendant, Brookman. According to the testimony of Mrs. Davey, the following conversations took place. She said, "Hello; is that you, Roy?" and he said, "Yes," and she said, "How about it?" He said, "All right; fine." She said, "How long?" and he said, "Call me in about 15 minutes," and he hung up, and when she called him in about 15 minutes she said, "This is Vera," and said, "How about it?" to which the defendant replied, "All right; come on."

It appeared from the testimony of Mrs. Davey that she had known of the defendant for about three years prior to the date in question, and had known him personally for about six months prior thereto, had bought narcotic drugs from him about ten times in that period, and was also accustomed to buying part of her supply of narcotic drugs from others in the same house, the home of Paul Cain, 1422 Nicollet avenue, Minneapolis, Minn.

Mrs. Davey testified that, when she was with the narcotic agents in the Federal Building at the time mentioned, she had no drugs in her possession. Her hair, purse, and outer clothing were searched by the narcotic officers, and she was then given $8, by Inspec-

tor Wall, left the Federal Building, located on Marquette avenue, with the officers, went out that avenue to Grant street, while Officers Wall and Heiberg proceeded on the other side of the same avenue, in the same direction, to the same point, keeping her in view at all times, to be certain that she communicated with no one.

When the intersection of Grant street and Nicollet avenue was reached, she crossed to the west side of Nicollet avenue. Inspector Heiberg did likewise. Wall remained at the intersection, where he could and did see Mrs. Davey at all times as she proceeded a block and a half to, and entered, No. 1422 Nicollet avenue, the residence of Paul Cain, and where, pursuant to the phone arrangement, she was to meet and receive from the defendant morphine and cocaine.

Heiberg kept within 25 or 30 feet of her until she entered 1422 Nicollet avenue, and then passed on beyond a short distance to the corner formed by the intersection of Nicollet avenue and Fifteenth street. Mrs. Davey testified that the defendant opened the door, conducted her to his bedroom, and produced the drugs, delivered them to her, and received from her the $8, the narcotic inspector had given her. After ten minutes in the house, she returned to the street, retraced her steps to the Federal Building following the same course taken on the outward movements, and was followed by the two inspectors on the other side of the avenue; both parties reaching the Federal Building at the same time. On arriving at the narcotic office, she delivered to Inspector Wall the cocaine and morphine she received from the defendant.

The testimony of Inspectors Wall and Heiberg, and of Mrs. Davey and of the government chemist, together with the drugs received by Mrs. Davey from the defendant, was all the evidence offered or received on the trial in connection with the first count in the indictment, and was not in any manner contradicted.

The evidence in support of the second count of the indictment, stated as briefly as possible, is as follows:

Narcotic Inspectors Wall, Stearns, Heiberg, and Hesse, on the forenoon of the 24th of September, 1923, shortly before noon, apparently having received information that led them to do so, went to the bedroom of one Ted Baggott in the Stockholm Hotel in Minneapolis, Minn., and found Baggott in bed; made a search of his room, but discovered nothing but wearing apparel. They re-turned to the narcotic office in the Federal Building, accompanied by Baggott, about noontime; remained there until about 3 o'clock. Baggott was a drug addict, and, according to the testimony, volunteered to assist the government in apprehending narcotic venders and peddlers, and as a result of the arrangement then made, using the telephone in the narcotic office, he called the phone number Kenwood 4310, at the residence of Paul Cain, 1422 Nicollet avenue, Minneapolis, Minn., the same phone and street number used by Vera Davey when she called up the same defendant from the narcotic office ten days before. Baggott used the phone three times. This occurred in the presence of the narcotic officers named and Minneapolis Police Officers Lehmeyer and Mullen, and apparently the phone conversations were along the same lines as those testified to by Vera Davey, and resulted in an arrangement by which Baggott was to meet and receive narcotic drugs from the defendant on Fifteenth street, around the corner from the intersection of Nicollet avenue with that street, and at a point where the north and south alley in the middle of the block opens onto Fifteenth street.

After the phone conversations, the four narcotic officers named had Baggott remove all of his clothes, including his shirt, undershirt, underwear, shoes, and stockings, which were thoroughly searched, including the seams, to ascertain whether Baggott had any money or narcotic drugs on his person, or in his clothes. Neither money nor drugs was found. After the search was completed, Baggott was given $3.50 in marked money, consisting of three $1 bills, the serial numbers of which were taken, and a 50-cent piece marked by a cross cut in the tail of the eagle.

Baggott then accompanied the narcotic and police officers named to the street and entered a Ford car, accompanied by Inspectors Wall and Hesse. Wall drove the car, and proceeded to a point on La Salle avenue, the first thoroughfare west of, and parallel to, Nicollet avenue, to a point between Fourteenth and Fifteenth streets. Arriving there, Baggott, with the marked money in his possession, left the car and proceeded to the corner of Fifteenth street and La Salle avenue, turned to his left, and proceeded east on Fifteenth street towards Nicollet avenue. The officers remained in the car and drove to the corner of Fifteenth street and La Salle avenue, which point had been reached by the other two narcotic officers and Police Officers Lehmeyer and Mullen in another car.

At this time the car last mentioned moved from the intersection of Fifteenth street and La Salle avenue, east towards Nicollet avenue, halting almost opposite the point at which the north and south alley running through the block in the rear of 1422 Nicollet avenue opens onto Fifteenth street, where the car was parked; the officers remaining in it, with the curtains of the car in place. Wall and Hesse, in the Ford car, moved up, coming to a halt in the rear of the other car.

When Baggott arrived on Fifteenth street, at the mouth of the alley mentioned, he was met there by the defendant, Brookman, who passed something to him, and he, in turn, passed something to Baggott, who, in accordance with the arrangement had with the officers, raised his hand to his cap and put what he received from the defendant under his cap. This all occurred with the six officers viewing the performance at a distance of not more than 30 feet. When this exchange was made between Baggott and the defendant, the officers started their cars and moved them diagonally across the street, to where Baggott and the defendant were standing.

When this movement of the cars was observed by the defendant, he started to run north in the alley mentioned, and threw from his hands what proved to be the three marked $1 bills, which were picked up by one of the pursuing officers. Baggott took from his cap and delivered to Inspector Wall the drug he received from the defendant, which proved to be a quantity of cocaine.

The defendant, within a short distance, was overtaken and placed under arrest, and was taken to the city police station. He tried, after he was arrested and before he reached the police station, to put one of his hands into one of his trouser pockets, but was prevented from doing so by the officers. At the police station the pocket was examined and found to contain the marked 50-cent silver piece. The defendant did not explain why he fled when the officers approached; he made no inquiries as to why he was being put under arrest, and declined to make any statement whatever.

The testimony of the six officers, eyewitnesses of the transaction, the drug received by Baggott from the defendant, and the testimony of the government chemist in relation thereto, was the evidence received in support of the second count, and it stands entirely undisputed.

On the evidence above detailed the verdict in this case rests, and on that evidence no other verdict was legally possible. The first

assignment of error presents three questions: First, whether jurors for the October, 1923, term of court were selected in the manner provided by law; second, if not, whether the defendant can complain of the manner in which they were selected, not having shown that his rights were in any manner prejudiced thereby; and, third, whether the right to challenge, if otherwise existing, was not lost, because not seasonably exercised.

[1] Before the jury was impaneled or sworn, the defendant interposed a challenge "to the entire panel of jurors of said term"; the ground of the challenge being that Mr. John R. Donohue was disqualified from acting as jury commissioner because of the fact that at an election held in the state of Minnesota on the 7th day of November, 1922, candidates for office on a ticket labeled "Farmer-Labor" received more votes than the candidates on the ticket labeled "Democratic"; the contention being that that fact operated ipso facto to disqualify and remove from office John R. Donohue, as jury commissioner for the district of Minnesota, and that the court was bound to take notice of the result of that election, treat the office of jury commissioner as vacant, and appoint a jury commissioner who was a well-known member of the "Farmer-Labor" party.

Section 276 of the Judicial Code (Comp. St. § 1253) provides that "all such jurors, grand and petit, including those summoned during the session of the court, shall be publicly drawn from a box containing, at the time of each drawing, the names of not less than 300 persons, possessing the qualifications prescribed in the section last preceding, which names shall have been placed therein by the clerk of such court and a commissioner, to be appointed by the judge thereof, or by the judge senior in commission in districts having more than one judge, which commissioner shall be a citizen of good standing, residing in the district in which such court is held, and a well-known member of the principal political party in the district in which the court is held opposing that to which the clerk may belong, the clerk and said commissioner each to place one name in said box alternately, without reference to party affiliations until the whole number required shall be placed therein."

It is stipulated that John R. Donohue was appointed jury commissioner 20 years ago by Judge William Lochren, the then judge of the United States District Court for the District of Minnesota; that Mr. Donohue was then, always has been, and is now a

member in good standing of the Democratic party; that the clerk of this court is a Republican; that Mr. Donohue has acted from the date of his appointment to the present time as such commissioner, and participated with the clerk in drawing the list of jurors for the October, 1923, term of this court, from which the jury was selected before which the defendant was tried. It is also stipulated that at the election held in the state of Minnesota on November 7, 1922, of the three parties presenting candidates, those of the Farmer-Labor party received several times as many votes as did the candidates of the Democratic party.

The defendant's contention, it will be noted, is that by reason of the facts stated the petit jurors for the October, 1923, term of court were illegally drawn, and for that reason the challenge interposed should have been sustained. No case has been called to my attention, and after a very careful examination I have been unable to find one, that lends any support whatever to the proposition that judges of the United States District Courts are required to keep their eyes trained on political thermometers and to record in their minds, at least, and be bound by, political changes resulting from state elections occurring in the districts in which their courts are held, and that the validity of the proceedings in all jury trials occurring depend upon the accuracy with which such proceedings are noted by the judges and on the correctness of the conclusions deduced by them therefrom.

I am satisfied that no support for such a doctrine can be found anywhere. Much confusion will be avoided in examining the case law on the subject, if a distinction is made between acts that are to be performed by the judge in making the appointment of a jury commissioner and the acts of the commissioner and clerk in the discharge of their duties. This distinction is made by Judge Pardee in United States v. Chaires (C. C.) 40 Fed. 820, 821, 822, in which it is said:

"An inspection of this statute shows that the work of preparing the names of the persons possessing the qualifications of jurors, and placing them in the box, is to be done by the clerk of the court and a jury commissioner to be appointed by the judge. The duty to be performed by these parties is clearly and specifically prescribed in the statute. It may be considered, and probably is, mandatory; but it is entirely distinct from the duty devolving, under the statute, upon the judge. The plea under considera-

tion relates entirely to the performance of the duty of the judge. By the statute, the judge is to appoint a commissioner, who shall be a citizen of good standing, who shall reside in the district in which the court is held, and who shall be a well-known member of the principal political party in the district opposing that to which the clerk belongs. The question is whether this part of the statute is mandatory or directory; whether, in appointing a jury commissioner, the judge, while endeavoring to comply with the law, must make no mistake of fact or of judgment, but must, at the peril of all subsequent proceedings, be sure to appoint a citizen, not only of standing, but of good standing, and not only a known, but a well-known, member of the principal political party opposed to that to which the clerk belongs. The statement of the question, and the nature of the case, satisfies us that the statute in this particular is directory, and not mandatory. What is the standard for a citizen in good standing? By what rule is it to be determined who is a well-known member of a political party? Considering that the judge has knowledge, judicial or otherwise, as to the political party of the clerk, by what rule is the judge to determine which is the principal party opposed? Suppose that the clerk is an independent or a prohibitionist? In case of a challenge to the array of jurors, or a plea in abatement, who is to try the issue? All matters and questions come back to the judge. The judge, in the exercise of a sound discretion, under the responsibilities of his office, directed by the statute, passes upon the qualifications of the jury commissioner he appoints, and his action would seem to be final and conclusive, except, perhaps, in the court that can call the judge to account for misbehavior in office. Particularly must this be the case where neither injury nor prejudice nor oppression is apparent nor is averred.

"We have examined the case of U. S. v. Ambrose, 3 Fed. 283, relied upon by counsel for defendants as holding that the statute, as to the qualifications of the jury commissioner, is not directory merely, but is mandatory. We find no such question in issue in that case, nor any holding or language of the presiding judge therein to warrant the conclusion that such ever was his opinion. The matter presented by this plea is naturally an interesting and tender subject to this court (one of the judges having made the appointment in question), and we would be disposed, ex propria motu, to sus-

pend ruling on this plea, and direct an issue thereon, and an investigation thereunder, but for the fact, of which we take judicial notice as a part of the history of this and the preceding term, that upon the identical question the court has had and allowed the fullest investigation; that the real issue therein was not as to whether the jury commissioner was a Democrat, and a known Democrat, but whether he was a well-known Democrat; and thereafter, upon the evidence, the court has held and decided that the jury commissioner was and is a well-known member of the principal political party in the district opposing that to which the clerk belongs (U. S. v. Ewan, 40 Fed. 451), and a further investigation is not necessary, either for the vindication of the court or the protection of parties."

In United States v. Caplis (D. C.) 257 Fed. 840, the defendants were charged with conspiracy to violate the Selective Draft Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k) and filed a plea in abatement, based on an allegation that the jury commissioner who assisted in the drawing of the grand jury which returned the indictment was not a well-known member of the principal political party in the district opposed to that to which the clerk belonged, as required by section 276 of the Judicial Code, as amended by the Act of February 3, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 1253). The clerk, it was alleged, was a Democrat; whereas the commissioner was registered as an Independent. Consequently the defendants allege that the grand jury was illegally drawn and that the indictment should be abated and set aside. The court said:

"The evidence shows that the clerk of court is a Democrat. The commissioner came originally from Illinois, and has lived in the state of Louisiana about 27 years, during which time he has always been regarded and considered a Republican. He testifies that he has considered himself a Republican ever since he was old enough to vote, and that he has never affiliated with the Democratic party, nor voted in its primaries, though on one or two occasions, in a local election, he has voted for the Democratic candidate; that he has served on the Republican state executive committee, and at one time was a candidate of that party for state treasurer. In Louisiana he has always voted the national Republican ticket, though he has sometimes in local elections 'scratched' a party candidate he thought undesirable, and voted for another on the opposite ticket whom he thought better qualified. Under a recent state statute, requiring that a voter fill in on his registration blank the party, if any, with which he affiliates, he registered as an Independent.

"While the defendants allege that they were greatly prejudiced as a result of such appointment of the jury commissioner, it has not been suggested, nor is it apparent in what way they were or could have been prejudiced. They do not claim to have themselves been members of a political party opposed to that of the clerk. There was no partisan alignment in the enactment of the Draft Law, and all patriotic citizens, regardless of party, have stood firmly for its enforcement. The same plea was made in the case of United States v. Chaires et al. (1899, in the Circuit Court for the Northern District of Florida, before Judges Pardee and Swayne) 40 Fed. 820, in which Judge Pardee, as the organ of the court, held that the provisions in the statute for the guidance of the court in the selection of a jury commissioner were advisory, and not mandatory. The court said: [The quotation is that made above from the Chaires Case.]

"The purpose of the act originally adopted in 1879 (Act June 30, 1879, c. 52, 21 Stat. 43), when many political questions were before the court, was to insure, as far as possible, the selection of jurors without regard to political bias. There were then but two political parties, or at least no third party of any consequence, and so it was provided that the commissioner should be selected from the principal political party opposed to that of the clerk. It was not contemplated, however, that in the making of a jury list each in turn should select a man of his own political faith; but, on the contrary, it was provided that such selection of jurors should be made without reference to party affiliation. This was the end to be obtained.

"Since then other parties have come into existence, and at times in certain districts it might be difficult to say which was the principal political party opposed to that of the clerk. One party might be considered such to-day, and another a week hence, after an election. Not only have new political parties arisen, but a large proportion of the electorate now aligns itself with no party, choosing rather to remain independent, to vote for those party nominees who may, in the opinion of the voter, be best qualified. As suggested in the query of Judge Pardee, suppose the clerk of the court is an Inde-

pendent, affiliated with no party, how is the law to be complied with? The case at bar presents the converse of that situation. The clerk belongs to the dominant political party, and the jury commissioner, although a lifelong Republican, is perhaps technically not a member of that party, because, in his registration, he designates himself an Independent. By his registration he denies to himself the right to participate in the primaries of either party, in order that he may remain free to vote in the general election as his own good judgment and conscience may dictate. Why should this disqualify him for appointment as jury commissioner? Would not the very purpose of the act, the elimination of politics or political influence in the selection of juries, be better subserved by the appointment of such an Independent than by the selection of a partisan, a 'well-known member of the political party opposed to that of the clerk'?

"The selection of a jury commissioner the law wisely leaves to the good judgment and sound discretion of the judge. Its provisions as to his party affiliation are advisory; but, even were the statute in this particular mandatory, rather than directory, in this instance it could not be said that the appointment was not in accord with the spirit of the act and in substantial compliance with its terms. The plea in abatement is accordingly overruled."

The two cases cited are the only ones called to my attention which deal directly with the precise question involved in the first assignment of error, and go directly to the act or omission of the judge in the performance of the duty imposed upon him by the provisions of section 276 of the Judicial Code, and if they announce a correct construction of section 276, supra, they dispose of the first assignment of error adversely to the petitioner.

[2] If for any reason the Chaires and Caplis Cases ought not to be followed, then under all the federal cases dealing with the subject, beginning with Agnew v. United States, 165 U. S. 36, 44, 17 Sup. Ct. 235, 41 L. Ed. 624, the challenge was properly overruled. The cases in which the manner of drawing juries under section 276 of the Judicial Code has been assailed are numerous, and an examination of them will disclose without an exception that they lay down the rule that any irregularity in drawing jurors, grand or petit, cannot avail a defendant whose rights have not been prejudiced thereby, and that the burden is upon him to show

by the averment of specific facts that he has been prejudiced, specifying how, in what manner, and to what extent, and, in making this showing, general statements and general conclusions of law or fact, or both, are to be avoided, and, if resorted to, will be disregarded. The following are probably the leading cases on this subject: Agnew v. United States, 165 U. S. 36, 44, 17 Sup. Ct. 235, 41 L. Ed. 624; United States v. Ambrose (C. C.) 3 Fed. 283, 286; United States v. Eagan (Judges Brewer and Thayer; C. C.) 30 Fed. 608; United States v. Benson (C. C.) 31 Fed. 896; United States v. Ewan (C. C. Fla.) 40 Fed. 451, 453; United States v. Chaires (C. C. Fla.) 40 Fed. 820, 822, 823; Wolfson v. United States (C. C. A. 5) 101 Fed. 430, 433, 41 C. C. A. 422; United States v. Greene (D. C.) 113 Fed. 683; United States v. Cobban (C. C. Or.) 127 Fed. 713, 715, 716; United States v. Merchants' & Miners' Trans. Co. (C. C. Ga.) 187 Fed. 355, 362; United States v. Nevin (D. C. Colo.) 199 Fed. 831, 833; United States v. Murphy (D. C. N. Y.) 224 Fed. 554, 559; Moffatt v. United States (C. C. A. 8) 232 Fed. 522, 529, 146 C. C. A. 480; Dunn v. United States (C. C. A. 5) 238 Fed. 508, 151 C. C. A. 444; United States v. Caplis (D. C.) 257 Fed. 840; Williams v. United States (C. C. A. 9) 275 Fed. 129.

The record shows no objections to any rulings made on the trial admitting or excluding evidence. The defendant did not go upon the stand, nor offer any evidence in his own behalf. The evidence as to his guilt was conclusive.

There were no exceptions taken to the charge, and there is no claim made that the defendant did not have a fair trial, nor that the jurors who sat in the case were not fair and impartial, and possessed of the qualifications required by law. In the challenge to the panel mentioned in the first assignment of error, there is no intimation or hint, by general allegation or specific averment of facts, or otherwise, that the defendant was in any manner prejudiced by the participation of Mr. Donohue as jury commissioner in the selection of jurors for the October, 1923, term of this court.

The question presented by the first assignment of error is a purely technical one, and if a writ of error can be had upon the record in this case, and a further delay of approximately one year obtained by the defendant, we have a situation similar to that referred to by Mr. Justice McReynolds, in Moore v. Dempsey, 261 U. S. 86, 93, 43 Sup. Ct. 265,

267, 67 L. Ed. 543, and one that will explain why lawlessness exists in the United States to a greater degree than in any other civilized country in the world: "If every man convicted of crime in a state court may thereafter resort to the federal court, and by swearing, as advised, that certain allegations of fact tending to impeach his trial are 'true to the best of his knowledge and belief' thereby obtain as of right further review, another way has been added to a list already unfortunately long to prevent prompt punishment. The delays incident to enforcement of our criminal laws have become a national scandal and give serious alarm to those who observe. * * * The recent execution of assassins in England within 30 days of the crime affords a striking contrast."

Warnings of the same nature as above have been, and are, being sounded by the federal courts from time to time. In Hyde v. United States, 225 U. S. 347, 363, 32 Sup. Ct. 793, 800 (56 L. Ed. 1114, Ann. Cas. 1914A, 614), speaking for the court, Mr. Justice McKenna said: "We must not, in too great a solicitude for the criminal, give him a kind of immunity from punishment because of the difficulty in convicting him—indeed, of even detecting him. And this may result if the rule contended for be adopted. Let him meet with his fellows in secret and he will try to do so; let the place be concealed, as it can be, and he and they may execute their crime in every state in the Union and defeat punishment in all. And the suppositions are not fanciful, as illustrated by a case submitted coincidently with this. Brown v. Elliott, post, p. 392. The possibility of such a result repels the contention and demonstrates that to yield to it would carry technical rules and rigidity of reasoning too far for the practical administration of criminal justice. * * * Nor do we think that the size of our country has become too great for the effective administration of criminal justice."

In United States v. Molloy (C. C.) 31 Fed. 19, Judge Brewer, speaking for the court, said: "But the trial court may have had, as my Brother Thayer had in this trial, the most abundant evidence that the defendant knew exactly the offense which was charged against him, and was prepared to go to trial upon it; and, if he did, all that the arraignment subserves was accomplished, and to say that he should be entitled to a new trial for that omission would seem to be, as Chief Justice Henry well says, 'like trifling with justice.' * * * If it be true, as I think must be apparent to any one, that the failure to formally arraign the defendant in this case was not a matter which tended to his prejudice, that by that failure he was not deprived of a single substantial right, that he was not put to trial without full notice of that for which he was to be tried, that he was not caught by any surprise or in any other way, it would, as Chief Justice Henry well says, seem to be 'like trifling with justice' to disturb the solemn verdict of the jury, and send the case to a new jury to review the same facts on another trial."

In Tubbs v. United States, 105 Fed. 59, 60, 44 C. C. A. 357, 358, Judge Caldwell, speaking for the court, said: "One contention is that these counts do not charge a public offense, because the letters themselves alleged to be obscene, lewd, lascivious, and indecent are not set out, and because the description of the letters is not so definite and precise as to enable the defendant to avail himself of a plea of former conviction or acquittal. These objections are answered by repeated decisions of the Supreme Court. The rule is stated in Rosen v. U. S., 161 U. S. 29, 40, 16 Sup. Ct. 434, 438, 40 L. Ed. 606, 609. In that case Mr. Justice Harlan, delivering the judgment of the court said: 'The doctrine to be deduced from the American cases is that the constitutional right of the defendant to be informed of the nature and cause of the accusation against him entitles him to insist, at the outset, by demurrer, or by motion to quash, and, after verdict, by motion in arrest of judgment, that the indictment shall apprise him of the crime charged with such reasonable certainty that he can make his defense and protect himself after judgment against another prosecution for the same offense. * * * Defendants in this class of cases commonly affect ignorance of what they are indicted for, and great apprehension lest they shall be indicted a second time for the very same offense, and be unable to prove by the record a former conviction or acquittal. No case of the kind has ever occurred, or is ever likely to occur, but the affected apprehension of each defendant that it may occur in his case is perennial. The Supreme Court has put a quietus on these stock objections by repeatedly pointing out that the defendant may apply for a bill of particulars (Rosen v. U. S., 161 U. S. 29, 34, 35, 39–41, 16 Sup. Ct. 434, 480, 40 L. Ed. 606; Durland v. U. S., 161 U. S. 306, 315, 16 Sup. Ct. 508, 40 L. Ed. 709), and that parol evidence is always admissible, and sometimes necessary, to establish the defense

of prior conviction or acquittal (Dunbar v. U. S., 156 U. S. 185, 191, 15 Sup. Ct. 325, 39 L. Ed. 390; Durland v. U. S., 161 U. S. 306, 314, 315, 16 Sup. Ct. 508, 40 L. Ed. 709)."

In McKinney v. United States, 199 Fed. 25, 29, 117 C. C. A. 403, 407, Judge Hook, speaking for the court, said: "There is an unfortunate tendency in criminal jurisprudence to raise minor matters to the dignity of substantial rights. The plain safeguards against governmental and private oppression have become by judicial action so embedded in nonessential additions and technical refinements that their true limitations are not always clear, and it not infrequently happens that criminal trials become mere adroit contests in which substance yields to form and the search for truth is diverted to and ends in collateral inquiries. Many an intelligent person accused of crime has been discharged for reasons so abstruse as to be beyond his comprehension, and the triumph has been not of innocence but of ingenious subtlety. Of course, fundamental safeguards should not be frittered away, but the growth of judicial construction should also be with due regard to the just rights of society and the practical conduct of trials. The evidence at the trial was sufficient to convict. It showed the accused contrived a scheme to defraud a woman whom he had promised to marry by working upon her love and anxiety for his welfare, and, by false representations of his critical illness in letters written by him and sent through the mails, to obtain from her remittances of money; that, having contrived the scheme, he used the mails in effecting it. His letters contained representations of great physical agony and distress, of the necessity of a surgical operation to save his life, of the performance of the operation, and of his continued illness, interspersed with repeated importunities for money and 'more money.' There was undisputed testimony that for a considerable period while his efforts were being made he was well and was walking about the streets. There is no merit in the objection made in the motion to quash that the grand jury was illegally constituted because it was drawn from a larger district than that in which the crime was committed. The crime was committed in the Southern judicial district of the Indian Territory before the statehood of Oklahoma. The grand jury was drawn after statehood from the body of the Eastern district of Oklahoma, which, though including the prior territorial district, was of much greater area. The judgment is affirmed."

In United States v. Garsson (D. C.) 291 Fed. 646, 649, in disposing of a motion to quash the indictment because an unauthorized person was permitted in the grand jury room when the grand jury was considering the case against the defendant, and because incompetent evidence was received by the grand jury, Judge Learned Hand said: "Finally, the defendants, recognizing that it is difficult to make a case for quashal by the scraps of evidence accessible, move for inspection of the grand jury's minutes. I am no more disposed to grant it than I was in 1909. U. S. v. Violon (C. C.) 173 Fed. 501. It is said to lie in discretion, and perhaps it does, but no judge of this court has granted it, and I hope none ever will. Under our criminal procedure the accused has every advantage. While the prosecution is held rigidly to the charge, he need not disclose the barest outline of his defense. He is immune from question or comment on his silence; he cannot be convicted when there is the least fair doubt in the minds of any one of the twelve. Why in addition he should in advance have the whole evidence against him to pick over at his leisure, and make his defense, fairly or foully, I have never been able to see. No doubt grand juries err and indictments are calamities to honest men, but we must work with human beings and we can correct such errors only at too large a price. Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime."

[3] Further considering the first assignment of error, the question remains to be answered whether the challenge questioning the manner in which the jurors for the October, 1923, term of court were drawn was seasonably interposed. The regular venire was issued September 17th; the special venire on October 6th. The defendant was taken into custody September 24th. The October term of court opened October 2d; the defendant was bound over to await the action of the grand jury on October 15th; the indictment was returned on October 19th; the defendant was arraigned and pleaded not guilty October 22d. The trial commenced and the challenge was interposed November 1st, all in 1923.

It thus appears that the point now urged against the manner in which the jurors were drawn was raised for the first time when the case was called for trial, 37 days after the defendant was taken into custody, 16 days after he was held to await the action of the grand jury, 12 days after the indictment was returned, and 10 days after he was arraigned and pleaded to the indictment. The record in the clerk's office on the day the defendant was taken into custody, September 24th, or on any day subsequent thereto, and before trial, if it had been consulted, would have yielded the information that John R. Donohue, as jury commissioner, participated with the clerk in drawing the jurors for the October, 1923, term of court. The challenge does not allege when the information was in fact acquired by the defendant. It does not negative the thought that he was aware, as he might have been, of Mr. Donohue's participation in the drawing of the jury as early as September 24, 1923.

On this state of facts, it is clear that the point urged has been determined adversely to the petitioner by the Supreme Court of the United States and the Circuit Court of Appeals of the Eighth Circuit. In Agnew v. United States, supra, a delay of five days after the indictment was returned was held fatal. The court said: "One of these rules is that the defendant must take the first opportunity in his power to make the objection. Where he is notified that his case is to be brought before the grand jury, he should proceed at once to take exception to its competency, for if he lies by until a bill is found, the exception may be too late. * * * The original venire was issued November 18, 1895; the second venire issued December 2, 1895. The court opened December 3, 1895, and the indictment was returned December 12, yet defendant did not file his plea in abatement until December 17. The plea does not allege want of knowledge of threatened prosecution on the part of defendant, nor want of opportunity to present his objection earlier, nor assign any ground why exception was not taken or objection made before; and, moreover, the plea is fatally defective in that, although it is stated that the drawing 'tended to his injury and prejudice,' no grounds whatever are assigned for such a conclusion, nor does the record exhibit any such."

This rule was followed and applied in the Circuit Court of Appeals of the Eighth Circuit, in Moffatt v. United States, 232 Fed. 522, 528, 529, 146 C. C. A. 480, 486, in which

Judge Elliott, speaking for the court, said: "It may be noted, also, that this plea contains no averment of specific facts showing that the defendant has been prejudiced or injured by the selection of the grand jurors in the manner alleged. It is not even alleged that any juror was disqualified. * * * An objection of this kind should be made at the earliest day that the defendant has an opportunity to make it. Nineteen days after the indictment was filed was held too great a delay in Lowdon v. United States, 149 Fed. 674, 79 C. C. A. 361. A delay of five days was noted in treating a plea as insufficient in Agnew v. United States, 165 U. S. 36, 17 Sup. Ct. 235, 41 L. Ed. 624. Such a plea, filed 19 days after service of process on the indictment, and more than 2½ months after it was returned, and which contains no statement as to when the fact of the indictment or the matters alleged first became known to the defendant, comes too late. United States v. American Tobacco Co. (D. C.) 177 Fed. 774, 777. Under the foregoing circumstances, even if the record was here, and it would sustain all of the allegations of the plea in abatement, the plea must be denied under the general rule of the federal courts, that omissions which do not impair any substantial right or prejudice the defendants, or accused, will be disregarded, unless otherwise required by positive statute. Section 1025, Revised Statutes. * * * This statute, in effect, directs that the existence of irregularity, if error of form, shall not be presumed a wrong to the accused; but it must be shown to be so. Of the irregularities alleged by these pleas and which are subject to this rule, may be mentioned those as to impaneling the jury, the disqualification of jurors, etc. If there were doubts whether this section includes irregularity in the entire procedure or only those of form in the indictment, the ruling of Mr. Justice Brewer, concurred in by Judge Thayer, in United States v. Molloy (C. C.) 31 Fed. 23, disposes of them in favor of the first proposition. United States v. Cobban (C. C.) 127 Fed. 713. A plea in abatement to an indictment, alleging that an order of the judge directing the selection of a certain number of names from each of several counties from which jurors were to be drawn constituted a manifest injury to the accused, without showing how accused was injured thereby, was insufficient. United States v. Merchants' & Miners' Transportation Co. et al. (C. C.) 187 Fed. 355."

Only two cases have been called to my attention in which attacks upon the manner of

drawing juries in federal courts have been sustained, and they relate to acts of the clerk and commissioner in discharging, or rather in not discharging the duties imposed upon them by section 276, supra: United States v. Murphy (D. C.) 224 Fed. 554, 559; Dunn v. United States, 238 Fed. 508, 151 C. C. A. 444. In each case a person who was not at the time, and never had been, so far as the record shows, clerk of the District Court, or jury commissioner, participated in the drawing of a panel of jurors. In the case of United States v. Murphy, supra, an assistant United States attorney, at the request of the jury commissioner, obtained the petit jury list of Onondaga county, N. Y., and copied a part of that list, and the names so copied, with 108 of his own selection, he placed in the jury box. It was held that, the jury commissioner not having participated in the selection of the names at all, the action of the stranger who did make the selection invalidated the proceeding.

In Dunn v. United States, supra, the clerk of the District Court had no part in the drawing of the panel of jurors for the term. He delegated that duty to a person who was a subordinate in his office, and it was held that the duty imposed upon the clerk was personal to him, and could not be delegated, and that the attempt on his part to delegate the duty of drawing the jury to his subordinate rendered the proceeding invalid. It is not necessary to quarrel with the rule laid down in either of the cases cited to sustain the action of Mr. Donohue in drawing the jury for the October, 1923, term of this court. The cases are not in point.

[4] The second assignment of error is that the court erred in charging the jury as follows: "In this case the defendant has not taken the witness stand, and the law is that he does not have to. It is the law that, when he does not take the witness stand, the jury has no right to draw any inference unfavorable to him, because he does not take the stand." This assignment can be disposed of with the statement that there was no exception taken to the charge, or any part of it. It was not error to so charge the jury.

The defendant did not, in fact, take the stand, nor did he offer any testimony whatever in his own behalf, while eight witnesses, six of them narcotic agents and members of the police force of the city of Minneapolis, testified directly as eyewitnesses to the commission of the crimes with which the defendant is charged in the indictment. Under the circumstances, in the interest of the defend-

ant, the court charged the jury as stated. The law thought to have been transgressed by the court in so charging the jury is the Act of March 16, 1878, 20 Stat. p. 30 (Comp. St. § 1465), which reads as follows: "That in the trial of all indictments, informations, complaints, and other proceedings against persons charged with the commission of crimes, offenses, and misdemeanors, in the United States courts, territorial courts, and courts-martial, and courts of inquiry, in any state or territory, including the District of Columbia, the person so charged shall, at his own request but not otherwise, be a competent witness. And his failure to make such request shall not create any presumption against him."

What the court said to the jury was merely a repetition of the four concluding lines of section 30, supra. The precise question arose in Hanish v. United States (C. C. A. 7) 227 Fed. 584, 586, 587, 142 C. C. A. 216, 218, 219. The court said: "Another alleged error was the comment of the trial judge upon the fact that the defendant did not testify. On this subject the court said: 'You are not, however, to take into consideration at all as against the defendant the fact that he did not testify. The law gives him an absolute privilege to testify or not to testify, as he deems best. If he goes on the witness stand and testifies, then he is like any other witness. If he does not come on the witness stand and testify, that is not in any sense to be taken against him. He is exercising only the absolute right which is given to him by the law. I do not mean by that to say that if he does not testify it is to be presumed that if he had testified he would have contradicted some other witness. There is no presumption one way or the other. I merely mean to say that his not testifying is not in a thought to be taken against him. * * * This instruction was evidently for the purpose of cautioning the jury not to make any inference against the defendant as they otherwise might have done. It was carefully guarded, and should receive the approval of the court. In any event, it could work no injury. On objection being made, the trial judge said it was done in defendant's interest, as we think it was."

[5] The third assignment of error is clearly and palpably frivolous. The proposition involved and urged is that the acts charged in counts 1 and 2 of the indictment are felonies, and that the indictment is fatally defective in not alleging that they were done feloniously or with felonious intent. The

question presented by this assignment was decided adversely to the contention of the petitioner by the Supreme Court of the United States 75 years ago, in United States v. Staats (1850) 8 How. 41, 12 L. Ed. 979, and the decision in that case has been consistently adhered to ever since. Bannon v. United States, 156 U. S. 464, 467, 15 Sup. Ct. 467, 39 L. Ed. 494; United States v. Thompson, Fed. Cas. No. 16,490; United States v. Corbin (C. C.) 11 Fed. 238, 240; United States v. Bayaud (C. C.) 16 Fed. 376, 383, 384; United States v. Debs (D. C. N. D. Ill.) 65 Fed. 210; United States v. Lake (D. C. Ark.) 129 Fed. 499, 501; Wood v. United States (C. C. A. 4) 204 Fed. 55, 56, 122 C. C. A. 369; United States v. Knoblauch (D. C. Neb.) 291 Fed. 407, 410.

In Bannon v. United States, supra, the court said: "Where the offense is created by statute, and the statute does not use the word 'feloniously,' there is a difference of opinion among state courts whether the word must be put into the indictment. 1 Bish. Crim. Proc. § 535. But under the decision in the Staats Case we are clearly of the opinion that it need not be done."

In Wood v. United States (C. C. A. 4) 204 Fed. 55, 56, 122 C. C. A. 369, 370, it is said: "The offense charged in each of these counts may be punished by imprisonment for more than a year. Defendants argue that it is therefore made a felony by section 335 of the Penal Code. * * * Neither count alleges that what is therein charged was feloniously done. The omission is said to be fatal to the validity of the counts. The government asserts that the above provision of the Penal Code has no application to breaches of the internal revenue laws. We do not find it necessary here to decide whether it has or has not. More than 60 years ago, in United States v. Staats, 8 How. 41, 12 L. Ed. 979, it was ruled that where a crime is made a felony by statute, it is not necessary to charge that it was feloniously committed, unless the statute itself makes a felonious intent an element of the offense."

[6] The point raised can also be disposed of on the ground that, if the word "feloniously" ought to have been used and its use was essential to the validity of the indictment, the defect is cured by verdict. It is well settled that, where an indictment or information omits a material allegation, the omission of which would be held fatal on a motion to quash, or on demurrer, and no attack is made before or during the trial, the defect is cured by verdict, and on a writ of

error the appellate court will presume that the court correctly charged the jury as to the law and as to the proof required in order that there might be a verdict of guilty, and will presume that the evidence received warranted and supported the verdict. United States v. Ball, 163 U. S. 662, 16 Sup. Ct. 1192, 41 L. Ed. 300; Kepner v. United States, 195 U. S. 100, 24 Sup. Ct. 797, 49 L. Ed. 114, 1 Ann. Cas. 665; Serra v. Mortiga, 204 U. S. 470, 27 Sup. Ct. 343, 51 L. Ed. 571; Lamar v. United States, 241 U. S. 103, 116, 36 Sup. Ct. 535, 60 L. Ed. 912; Sonnenberg v. United States (C. C. A. 9) 264 Fed. 327; McGrath v. United States (C. C. A. 2) 275 Fed. 294; Bishop's New Criminal Procedure (Ed. 1913) vol. 2, § 707a; Wilson v. United States (C. C. A. 2) 275 Fed. 307, 311.

In the case of Serra v. Mortiga, supra, the Phillippine law under consideration provided that: "Adultery is committed by a married woman, who lies with a man not her husband, and by him who lies with her *knowing that she is married* [italics by the court], although the marriage be afterwards declared void." The indictment failed to allege that the defendant Serra, at the time of the commission of the act, knew that his codefendant, Maria Obleno, was a married woman. The court said:

"The defendants were arraigned, pleaded not guilty, were tried by the court without a jury and were convicted. The court stated its reasons in a written opinion, analyzing the testimony and pointing out that all the essential ingredients of the crime of adultery, as defined by the articles of the penal code already referred to, were shown to have been committed. The accused were sentenced to pay one-half of the costs and to imprisonment for two years, four months and one day. The record does not disclose that any objection was taken to the sufficiency of the complaint before the trial. Indeed, it does not appear that by objection in any form, directly or indirectly, was any question raised in the trial court concerning the sufficiency of the complaint. An appeal was taken to the Supreme Court of the Philippine Islands. In that court error was assigned on the ground, first, that 'the complaint is null and void because it lacks the essential requisite provided by law.' * * * The conviction was affirmed. The assignment of error which was based on the contention that the conviction was erroneous because the complaint did not sufficiently state the essential ingredients of the offense charged, was thus disposed of

by the court in its opinion: 'The objections to the complaint, based upon an insufficient statement of the facts constituting the offense, cannot be considered here, because they were not presented in the court below. United States v. Sarabia, 3 Off. Gaz. No. 29.' * * *

"For the purpose, therefore, of passing on the errors assigned, we must test the correctness of the action of the court below by substantially the same criteria which we would apply to a case arising in the United States and controlled by the Bill of Rights expressed in the amendments to the Constitution of the United States. Turning to the text of the articles of the Philippine Penal Code upon which the prosecution was based, it will be seen that an essential ingredient of the crime of adultery, as therein defined, is knowledge on the part of the man charged of the fact that the woman with whom the adultery was committed was a married woman. Turning to the complaint upon which the prosecution was begun, it will be at once seen that it was deficient, because it did not specify the place where the crime was committed, nor does it expressly state that Vicente Serra, the accused man, knew that Maria Obleno, the woman accused, was at the time of the guilty cohabitation a married woman. It results that there were deficiencies in the complaint which, if raised in any form in the trial court before judgment, would have required the trial court to hold that the complaint was inadequate, but the question for decision is not whether the complaint, which was thus deficient, could have been sustained, in view of the constitutional guaranties, if a challenge as to its sufficiency had been presented in any form to the trial court before final judgment, but whether, when no such challenge was made in the trial court before judgment, a denial of the guaranties of the statutory Bill of Rights arose from the action of the appellate court in refusing to entertain an objection to the sufficiency of the complaint because no such ground was urged in the trial court. Thus reducing the case to the real issue enables us to put out of view a number of decisions of this court referred to in the margin, as well as many decided cases of state courts referred to in the brief of counsel, because they are irrelevant, since all the former and, if not all, certainly all of the latter, concern the soundness of objections made in the trial court, by the accused, to the sufficiency of indictments or informations. * * *

"Thus the proposition is that the court should have reversed the conviction because of the contention as to the insufficiency of the complaint, when no such question had been raised before final judgment in the trial court, and when, as a necessary consequence of the facts found by the court, the testimony offered at the trial without objection or question in any form established every essential ingredient of the crime. In other words, the contention is that reversal should have been ordered for an error not committed and when the existence of injury was impossible to be conceived, in view of the opinion which the court formed on the facts in the exercise of the authority vested in it on that subject."

The judgment of the Supreme Court of the Philippines was affirmed.

To support their contention counsel for the petitioner rely upon Cohn v. United States (C. C. A. 2) 258 Fed. 355, 169 C. C. A. 371. The decision in that case is in direct conflict with the doctrine laid down by the Supreme Court of the United States in the Ball, Kepner, Serra, and Lamar Cases, supra, and, of course, is not an authority supporting the proposition for which counsel contend.

[7] The fourth and fifth assignments of error are directed against the order of the court overruling the defendant's motion for a new trial, and raise no question that could be considered by the appellate court, if a writ of error were allowed, for the reason that such an order is discretionary, and therefore cannot be reviewed on a writ of error. This rule in the federal courts is as well settled as the fact that the letter A is the first letter of the alphabet.

[8] The sixth assignment of error is that "the trial court erred in denying the defendant's motion in arrest of judgment herein." Because of its utter disregard of the requirements of rule 11, this assignment raises no question that could be considered in the appellate court, if a writ of error were allowed. Van Gunden v. Virginia Coal & Iron Co. (C. C. A. 4) 52 Fed. 838, 840, 3 C. C. A. 294; City of Lincoln v. Street Light Co. (C. C. A. 8) 59 Fed. 756, 8 C. C. A. 253; Lincoln Savings Bank & Safe-Deposit Co. v. Allen (C. C. A. 8) 82 Fed. 148, 27 C. C. A. 87; City of Anniston v. Safe-Deposit & Trust Co. (C. C. A. 5) 85 Fed. 856, 29 C. C. A. 457; Walton v. Wild Goose Mining & Trading Co. (C. C. A. 9) 123 Fed. 209, 60 C. C. A. 155.

This assignment of error does not indicate what the grounds of the motion in arrest of

judgment were, nor does it state the particulars in which it is claimed the court fell into error, and the court is not bound to go beyond the limits of the assignment in search of that information. If the court were to go back to the motion in arrest of judgment, which is found in the bill of exceptions, it would find that it fails to give the same information. It does, however, state that the information can be had if the court will take a third step back to the defendant's "motion for new trial and motion to quash the indictment."

Following the course indicated, and going back to the "Motion for new trial and motion to quash the indictment," it appears that the sixth assignment of error raises the same question as the third; that is, it challenges the sufficiency of the indictment as a pleading, because of its failure to use the word "feloniously" in characterizing the act with which the defendant is charged, and is disposed of by reference to what was said in disposing of the third assignment of error. It is true that by the motion in arrest of judgment it is sought to question the validity of the proceedings by which the panel of petit jurors for the October, 1923, term of this court was drawn, but it is elementary that no such question can be raised or considered on such a motion.

[9] A motion in arrest of judgment can only reach errors apparent on the face of the record. The evidence relied upon to sustain the challenge is found in the bill of exceptions, but that cannot be resorted to on the motion in arrest of judgment. Carter v. Bennett (1853) 15 How. 354, 14 L. Ed. 727; United States v. Gale (1883) 109 U. S. 65, 69, 3 Sup. Ct. 1, 27 L. Ed. 857; Bond v. Dustin (1884) 112 U. S. 604, 608, 5 Sup. Ct. 296, 28 L. Ed. 835; Van Stone v. Stillwell et al. (1891) 142 U. S. 128, 135, 12 Sup. Ct. 181, 35 L. Ed. 961; Adams v. Shirk (C. C. A. 7) 104 Fed. 54, 61, 43 C. C. A. 407; Demolli v. United States (C. C. A. 8) 144 Fed. 363, 366, 75 C. C. A. 365, 6 L. R. A. (N. S.) 424, 7 Ann. Cas. 121; United States v. Marrin (D. C.) 159 Fed. 767; United States v. Maxey (D. C.) 200 Fed. 997.

In Bond v. Dustin, supra, it is said: "The attempt to sustain the motion in arrest of judgment, by an argument that the evidence was insufficient to warrant a recovery in this action, fails for the same reason, as well as because a motion in arrest of judgment can only be maintained for a defect apparent upon the face of the record, and the evidence is no part of the record for this purpose. Carter v. Bennett, 15 How. 354."

In Demolli v. United States (C. C. A. 8), supra, Judge Van Devanter, speaking for the court, said: "Complaint is made of the overruling of a motion in arrest of judgment. The indictment did not set forth the names of any of the persons to whom the newspapers were addressed, but stated that they were unknown to the grand jury, and the defendant, conceiving that the evidence produced at the trial showed that the grand jury had been informed of the names of at least two of these persons, moved in arrest of judgment for that reason. The motion was properly overruled. Judgment can be arrested only for matter appearing on the face of the record, and the evidence is not part of the record for this purpose. 1 Bishop, New Crim. Proc. § 1285; Wharton's Cr. Pl. & Pr. (9th Ed.) §§ 759, 766; Bond v. Dustin, 112 U. S. 604, 608, 5 Sup. Ct. 296, 28 L. Ed. 835; Van Stone v. Stillwell, etc., Co., 142 U. S. 128, 135, 12 Sup. Ct. 181, 35 L. Ed. 961; Adams v. Shirk, 43 C. C. A. 407, 414, 104 Fed. 54, 61."

The rule stated is elementary. It was applied by the Supreme Court of the United States 71 years ago in Carter v. Bennett, supra, and by the Circuit Court of Appeals of the Eighth Circuit 28 years ago in Demolli v. United States, supra, and it is as old as the English common-law system, and as familiar to the legal profession as the proposition that two and two make four is to mathematicians; but it is no more familiar than the proposition decisive of the question raised by the first assignment of error, that an attack upon the manner in which a panel of jurors has been drawn, that does not allege specific facts showing resulting prejudice to the substantial rights of the defendant, is unavailing.

And this statement applies also to the question sought to be raised by the third assignment of error, that the omission of the word "feloniously" from the indictment constitutes a fatal defect, though the word does not appear in the statute defining the offense. Seventy-three years ago, in the Staats Case, supra, the Supreme Court of the United States decided the precise point adversely to the defendant's contention, and 30 years ago in the Bannon Case, supra, in the same court it was held that, "under the decision in the Staats Case, we are clearly of the opinion that it need not be done."

And with equal force the statement applies to the fourth and fifth assignments of error,

which seek to present the question whether the court erred in refusing to set aside the verdict and grant a new trial. It is simply inconceivable that attorneys practicing in the federal courts are not familiar with the rule that a motion for a new trial is addressed to the discretion of the court, and that an order overruling the same cannot be assigned as error.

[10] If all the questions sought to be raised by the assignments of error have been decided adversely to the contention of the defendant in the appellate court to which this case would go if a writ of error were allowed, or by the Supreme Court of the United States, or by both courts, the question suggests itself: For what purpose is the writ sought? Can it be for any other purpose than delay? In that state of the law the case would be affirmed as a matter of course, if the writ were allowed.

If there is no merit in the questions sought to be raised by the writ of error, if the questions so sought to be presented have, as suggested, been authoritatively decided adversely to the contention of the petitioner, then to allow the writ in such a case, to use the language of Mr. Justice Bradley in United States v. Gale, supra, "would be trifling with justice, and would render criminal proceedings a farce," and would be a notable contribution to the laxity in the enforcement of the criminal laws which recently led Mr. Justice McReynolds to declare that "the delays incident to enforcement of our criminal laws have become a national scandal and give serious alarm to those who observe." Moore v. Dempsey, supra.

It is a matter of common knowledge, of which courts are bound to take judicial notice, that one of the most frightful evils afflicting mankind to-day, and particularly in the United States, is the drug habit, and that the government of the United States has been unremitting in its efforts for years to eliminate the evil by stringent laws, and by treaties with countries within whose boundaries the plants are cultivated from which the drugs are derived. Within the last 60 days the government has broadcasted over the country an official bulletin declaring that over 3,000,000 Americans are now victims of that habit, and that the number is rapidly increasing.

The undisputed evidence in this case shows that the defendant is a drug peddler, spreading the habit and pandering to the appetites of persons within the grasp of the malady, and is located where the business can be profitably carried on, at 1422 Nicollet avenue, in the family hotel and apartment house district of Minneapolis. To allow the writ of error would permit the defendant to be at large and ply his trade for practically one year, which, of course, is no argument against allowing the writ, if the facts disclosed by the record warrant its allowance.

The responsibility for the conditions described above, at least after indictments are returned, rests very largely upon federal courts and judges, so far as the enforcement of the federal laws are concerned. Congress has gone as far, probably, as it constitutionally can go in vesting in the courts and judges power to brush aside and disregard errors and technicalities that do not affect the substantial rights of persons charged with crime.

The first notable effort in that direction was the enactment of section 1025 of the Revised Statutes (Comp. St. § 1691), which reads as follows: "No indictment found and presented by a grand jury in any district [or circuit] or other court of the United States shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant."

This was followed by the Act of February 26, 1919, which reads as follows: "On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." 40 Stats. at L. p. 1181 (Comp. St. Ann. Supp. 1919, § 1246).

After a most careful consideration of the questions presented, I have reached the conclusion that the showing made does not warrant the allowance of a writ of error. If I had been doubtful on that point, I should have allowed the writ and refused a supersedeas.

The petition for a writ of error is denied.